O’NIELL, C. J.
The question presented is whether the board' of commissioners of the port of New Orleans may lawfully sublease to the International Harvester Company a part of the floor space of a warehouse which the board has under lease from the United States.
During the World War, the United States government constructed on the river front, in New Orleans, on land bought by the government for the purpose, an elaborate army supply base, for the storage and transshipment of overseas freight. The project consisted of three warehouses; each 600 feet long, 140 feet wide, 6 stories high, built of reinforced concrete, with a steel and pile wharf and wharfhouse, 2,000 feet long and 140 feet wide, and with multiple-deck connecting bridges, of structural steel, spanning the inteivening street and railroad tracks, and joining the wharfhouse and warehouse units. Tbe total floor space or area of the three warehouses and the wharfhouse is 48 .acres. Nearly 9 miles of railroad track serve the plant, ,capable of accommodating more than 700 cars. The establishment cost the .government nearly $20,000,000; and, although it was intended primarily as a wartime measure, it was located and constructed with the view of making it also a valuable addition to the peacetime operations of this great seaport. The warehouses are designated by the numbers, 1, 2 and 3, respective^ ly," and are in alignment distant less than 600 feet from the river, warehouse No. 1 being less than 400 feet from the water line of the Inner Harbor Navigation Canal, connecting-the Mississippi river with Lake Pontchartrain. The canal was cut by the board of commissioners of the port of New Orleans, under authority of an amendment to the Constitution, adopted in 1914, pursuant to Act 244 of 1914, p. 475, and is under the administration and control of the board. See Constitution, art. 6, § 16.
The wharf and warehouses were ip-full' use by the War Department when the war ended. Then the government had no use for the wharf, and needed only the warehouse space necessary for the supplies on hand, until they could be disposed of. Two of the warehouses were sufficient.
The board of commissioners needed the wharf, and undertook to buy it. The government would not sell, but was willing to lease, the wharf, but not without leasing also warehouse No. 1, for which the government had no use. By act of Congress approved July 11, 1919 (41 Stat. 129, 130), the War Department was authorized to sell or lease any surplus property acquired for storage purposes subsequent to April 6, 1917. That was the status of warehouse No. 1, and of the wharf and wharfhouse.
The contract of lease, between the government and the board of commissioners, of the wharf and wharfhouse and warehouse No. 1, was entered into on the 12th of June, 1922. The lease was made for the term of 20 years and became effective on the 13th of September, 1922. The board agreed to pay $114,250 rent for the first year, $132,750 for each *667 of the succeeding four years, and, for each succeeding five-year period, half of the average annual gross revenues of the preceding five years, less the cost of necessary repairs, etc. On the 15th of September, 1922, a considerable portion of the wharf and wharf-house was destroyed by fire. The board was therefore, by the terms of the lease, entitled to a reduction of the 'rent. By contract dated February 5, 1923, the original contract between the United States government and the board of commissioners was revised. The rent was reduced to $23,150 for the first year, from the 13th of September, 1923, and to $65,000 for each of the remaining 19 years; and the'board agreed to reconstruct, at the board’s expense, allowing the government the option of purchasing, the wharf and wharfhouse, connecting bridges, trestles, etc., hs specified in the new, contract.
The board of commissioners, of course, had no use for the warehouse, having leased it only because the wharf and wharfhouse, which the board did need, could not have been had without the warehouse. The intention of the board was to sublet the warehouse, if that could be done, to reduce the rent to be paid for the wharf and wharf-house, and, incidentally, to bring more business to the port.
The wisdom of the board, in taking a lease on the warehouse along with the wharf, with the intention of subletting the warehouse, is demonstrated by the transaction which the board is about to make with the International Harvester Company. The company has agreed to lease the fourth, fifth and sixth floor of the warehouse, and an aisle space of 5,600 square feet on the first floor, and three elevators, for the term of 10 years, with the privilege of renewal for another term of 10 years, the total rental for the first 10 years to be $713,200, payable in equal monthly installments,' each in advance, and the total .rental for the additional 10 years, if the lease be extended, to be $868,000, payable in equal monthly installments, each in advance. If the proposed transaction is lawful, the board will collect from the harvester company, for the first 10 years, $105,050 more for the subleased part of the warehouse than the board will pay to the government for the entire warehouse and the wharf and wharf-house ; and, if the lease should be extended for the additional 10 years, which is very probable, the board will collect $218,000 more for that period than the board will pay for all of the property leased from the government. What is perhaps more important is that the International Harvester Company, one of the largest manufacturing concerns in the country, will use the leased premises for the construction and operation of a factory, and for the storage of material and manufactured products, which will go through the port of New Orleans in interstate and foreign commerce.
The Attorney General, in questioning the authority of the defendant board to make the contract of lease with the harvester company, admits frankly that he is more doubtful than sure that the proposed lease is ultra vires.
We regard the proposed lease of this surplus warehouse space as a consummation of the whole transaction by which the board of commissioners acquired the wharf and wharfhouse necessary for the proper administration of the board’s affairs; and we agree with all of the parties to this suit that the consummation is devoutly to be wished.
 By the second section of the statute creating the defendant board, Act 70 of 1896, it was made the duty of the board to take charge of and administer the public wharves of the port of New Orleans, and to construct new wharves and sheds wherever necessary, etc. By the corresponding section of’Act 14 of 1915, the authority and duties of the board *669 were extended and stated more in detail; and it was then expressly declared that the board should have and enjoy all of the rights, powers and immunities incident to corporations.
By several statutes and provisions of the Constitution, the “dock board,” as the defendant is commonly called, has full and complete power of administration over the public wharves, sheds and appurtenances along the river front, and over the warehouses, elevators, etc., owned by the board. Beyond all doubt the board had the authority to acquire the wharf in front of the warehouse in question, by lease from the government; and, to that end, the board had the right to take over the warehouse itself, as an indispensable part of the transaction. It would be a strained construction of the law indeed to say that, having acquired the warehouse as a necessary incident to the acquisition of the wharf, and having no use for the Warehouse now, the board cannot sublease the warehouse, even though it will make the whole transaction profitable, and add greatly to the commerce of the port.
The argument that the board is not supposed to lease to individuals or to private corporations the public property administered by the board is quite beside the question. Of course, the law does not intend that the board may delegate its power, of administration by leasing to individuals or to private corporations the property which the law requires the board itself to administer. But the board is not attempting to delegate its power of administration; it is only disposing temporarily of property for which the board has now no use. And the proposed disposition is only an incident, or necessary consequence, of a transaction which the board had authority to make.
 The investment in the board of “all rights, powers and immunities incident to corporations” means, not that the board has all or any of the powers that any corporation may have, but that the board has all of the in - cidental or implied powers that a political corporation needs to perform the duties that are expressly imposed upon it, or to fulfill the objects and purposes for which it was created. In allowing the board to do whatever is necessary for the exercise of the authority and ' duties expressly conferred upon it, the law does not put a very strict meaning upon what is necessary, but leaves the matter in some measure to the discretion of the board.
Section 12 of article 4 of the Constitution, prohibiting any loan, pledge or grant of any funds, credit, or thing of valué, of the state or of any political corporation, to any person or persons, or corporation, public or private, is not appropriate to this transaction. The proposed sublease is not, within the meaning of the constitutional mandate, a loan, pledge, or grant, of any fund, credit, or thing of value, of the state or of the dock board. The right of occupancy of the warehouse is .not now of any value to the state, or to the dock board, except for the right to sublease it and collect the rént.
Our conclusion is that the judgment appealed from, declaring the proposed lease to the International Harvester Company valid, ahd rejecting the demand of the state for a writ of injunction, is correct.
The judgment is affirmed.