DUBUQUE FIRE AND MARINE IN-
SURANCE COMPANY

v.

UNION COMPRESS AND WARE-
HOUSE COMPANY et al.

UTAH HOME FIRE INSURANCE
COMPANY

v.

UNION COMPRESS AND WARE-
HOUSE COMPANY et al.

GULF INSURANCE COMPANY

v.

UNION COMPRESS AND WARE-
HOUSE COMPANY et al.

HOUSTON FIRE AND CASUALTY
INSURANCE COMPANY

v.

UNION COMPRESS AND WAREHOUSE
COMPANY et al.

TRINITY UNIVERSAL INSURANCE
COMPANY

v.

UNION COMPRESS AND WAREHOUSE
COMPANY et al.

GENERAL INSURANCE COMPANY
OF AMERICA

v.

UNION COMPRESS AND WAREHOUSE
COMPANY et al.

PACIFIC NATIONAL FIRE INSUR-
ANCE COMPANY

v.

UNION COMPRESS AND WAREHOUSE
COMPANY et al.
(Consolidated cases)
Civ. A. Nos. 4607–4613.

United States District Court
W. D. Louisiana, Monroe Division.
July 30, 1956.

Thomas W. Davenport, James J. Davidson, Jr., and Richard C. Meaux, Davidson, Meaux, Onebane & Nehrbass, Lafayette, La., for plaintiffs.

John C. Morris, Jr., Hunt & Morris, Rayville, La., for defendants.

BENJAMIN C. DAWKINS, Jr., Chief Judge.

These consolidated cases, tried without jury, are the aftermath of a disastrous fire which occurred at Delhi, Louisiana, on November 12, 1953, destroying more than 3,000 bales of cotton, worth about $450,000, and two fairly large buildings, one of which was insured jointly by plaintiffs. They contend that defendants are responsible to them for the loss they thereby sustained.

The background facts are these: About 1940 or 1941, a group of public-spirited citizens of Northeast Louisiana, taking note of the advantages to be derived from a change in the former one-crop economy that had prevailed in the area for many generations, organized a non-profit corporation which they named Northeast Louisiana Livestock Show, Inc. (called "Livestock").

The principal purpose of the corporation was to educate the farmers of the area as to the profits and other advantages to be had in utilizing at least part of their lands for raising, and up-grading, livestock of all kinds.

To that end, the officers and board members of the corporation carried on an educational campaign among the people, high-lighted by a series of livestock shows. At first these shows were held in an old, unused warehouse at Delhi, loaned by Union Compress and Warehouse Company, Inc. (called "Union"), which operated a cotton compress and warehouse there. After several years the shows had outgrown the warehouse, and larger facilities were needed. In 1946, working with like-minded citizens in other areas of the State, they succeeded in obtaining from the Louisiana Legislature an appropriation in favor of Louisiana State University and Agricultural and Mechanical College (called "L. S. U."), in the sum of $150,000, which was to be divided equally and used for erection of livestock exhibit buildings at Delhi, in North Louisiana, at Alexandria, in the central part of the State, and at Arabi, in South Louisiana.

The appropriation was made in the General Appropriations Act of 1946, and direction as to the development and maintenance of the facilities was contained in Act No. 174 of 1946, LSA–R.S. 3:2041 et seq. The Statute provided for donation of land, upon which the buildings were to be erected, by the Parishes of Richland, Rapides, and St. Bernard, and the Police Juries of the respective Parishes were required to maintain them. Following this legislative action, and through Livestock working with the Agricultural Extension Division of L. S. U., headed by Dean G. J. Lee of the College of Agriculture, a quonset-type cattle barn was erected at Delhi, on land acquired by the Richland Parish Police Jury, and donated by it to L. S. U. In order to stretch the available money as far as possible, Livestock's officials called upon the local citizenry and governing authorities for contributions in the form of labor, free use of Police Jury and municipal trucks, and other such items. The structure was completed in 1947, and the first of a series of expanded livestock exhibits was held that year, under the joint auspices of Livestock and L. S. U.

Later, in about 1952, the shows having outgrown the L. S. U. building, Livestock erected its own building, partly on L. S. U.'s land, of a gable-roof type of construction, immediately adjacent to, and abutting, L. S. U.'s building. Thereafter, the two buildings actually were regarded and used almost as one, large doors leading from one to the other. The L. S. U. building was 120 feet wide and 160 feet in length, and Livestock's building was of the same width, and 135 feet long. Both were of metal frame construction, with a common connecting wall, but with different types of roofs.

Besides serving their primary purpose for livestock shows, the buildings were utilized by the community generally, as might have been expected in a small town with no other facilities for accommodating large crowds, for church gatherings,

political rallies, soil conservation meetings, and other public purposes.

While maintenance responsibility was placed in the Parish Police Jury by the Act of 1946, actually that body, which sat at Rayville, about seventeen miles away, never had anything to do with L. S. U.'s building other than to acquire and donate the land on which it was erected. No one from L. S. U. attempted to exercise any direct control of its upkeep, and, by more or less common consent, Livestock managed its foster brainchild as a proud and loving *pater familias* would have done. It even had a small office building on the premises, immediately adjacent to the barns, from which such operations were directed.

Under this loose, informal arrangement things went along quite happily until the early fall of 1953. In that year, notwithstanding the program of cash-crop diversification promoted by Livestock, and planting controls imposed by the Federal Department of Agriculture, the farmers of the area, like their brothers all over Dixie, brought forth a bumper cotton harvest of nearly overwhelming proportions. All regular warehouses were filled to capacity and freshly-ginned cotton was standing in the open. The rub of this was that prices for cash sales of the commodity were running well below "parity" loan values, and loans could be gotten only upon negotiable warehouse receipts. To get these valuable chits, the farmers had to have a place to store their cotton.

A real emergency thus was presented. Farmers, suppliers, bankers—all were threatened with financial ruin, as was indeed the entire economic life of the area. In such circumstances, and in characteristic American fashion, the people sought to improvise. Looking about for covered storage space, their eyes naturally lit upon the two large livestock barns, which were not then being used for their designed purpose and together were capable of holding approximately 3500 bales. Pressure was put upon Union's officials, who in turn contacted Livestock's board, making inquiry as to availability of the barns. Immediate consent was obtained for use of Livestock's building as a temporary cotton storage warehouse, but its President, Mr. W. P. Martin, advised Union that proper permission would be necessary before L. S. U.'s barn could be put to such extraordinary use. There is a conflict in the testimony as to whether Dean Lee, of L. S. U.'s Agricultural School, granted such permission. However, after considering all the evidence on the point, as more fully shown later herein, we are convinced that, after being advised by Mr. Martin of the serious situation prevailing, the Dean authorized use of the L. S. U. building for that purpose. This happened about October 9, 1953.

Later, on October 27, 1953, a final agreement was reached whereby, for use of the buildings until February 15, 1954, Union would pay Livestock $500, to be used for promoting exhibits, and would pay the excess in fire insurance premiums, above normal rates, required by such extra-hazardous use of both facilities. No rental consideration was to be paid to L. S. U. On October 28th, Mr. Martin called Dean Lee by telephone, advised him that Union had begun that day to move cotton into the buildings, told him of Union's agreement to pay the additional insurance premiums, and was informed by the Dean that he would notify L. S. U.'s fire insurers of the arrangement.

Storage of cotton proceeded at the rate of about 300 bales per day. By November 12th, L. S. U.'s building was full and work was going forward toward filling Livestock's. About 3,000 bales had been stored when fire broke out, flashed through both buildings, and quickly destroyed cotton, buildings and all else in them.

Plaintiffs paid L. S. U., according to their respective proportions of fire insurance coverage, the total sum of $39,429.34. Express assignments and subrogation to L. S. U.'s rights, if any, were taken by plaintiffs against those allegedly responsible for the fire, and these suits followed. Identical allegations in each

suit set forth plaintiffs' contentions that defendants, Union and Livestock, are liable to them. These may be paraphrased, in the order of their statement, as follows:

1. That defendants were trespassers on L. S. U.'s property, no proper permission or consent from the owner having been obtained;

2. That use of the property for cotton storage was contrary to, and in derogation of, the laws of Louisiana, and in particular Act 174 of 1946, LSA–R.S. 3:2041–3:2044, "which expressly provided that said property was to be used solely and exclusively for holding livestock shows";

3. That although it is customary in the cotton storage business for buildings to "be divided into compartments, divisions, areas or units with fire walls separating them, * * * no such provision was made" by defendants in L. S. U.'s barn;

4. That the barn was not properly equipped or constructed for use in storing cotton, a highly combustible material, having no proper fire fighting equipment, such as fire hoses, extinguishers, or automatic sprinkling devices; that, accordingly, defendants made no provision whatever adequately to protect the building against fire in those respects;

5. That, well knowing about all of the above deficiencies in safety equipment, Livestock aided and assisted Union in committing the trespass referred to, no permission having been given by L. S. U.;

6. That the barn and all of its contents were in the exclusive possession and control of defendants; that the fire ordinarily would not have occurred had due care been exercised; and, therefore, that the doctrine of "res ipsa loquitur" is applicable;

7. In the alternative, in the event res ipsa loquitur is not applicable, that defendants negligently permitted a "hot bale" or "fire bale" to be brought into the building, without detecting its presence; and that the bales were improperly stacked, with insufficient space between them, so as to prevent the spread of fire from a "fire bale" or other causes;

8. That defendants negligently permitted cotton lint, of a highly inflammable nature, to permeate the air and remain on the floor of the barn;

9. That defendants' employees were permitted to smoke in this highly dangerous area;

10. That defendants failed to provide watchmen so as properly to protect the building against fire.

In their answers to the suits, defendants deny that *res ipsa loquitur* is applicable, and categorically deny all specific allegations of negligence made against them, contending that all due and requisite care was used. They further deny that L. S. U.'s building was used without proper permission, and contend that Dean Lee, who had over-all charge of the building for L. S. U., expressly gave his permission to Mr. Martin, Livestock's President; that accordingly, Union was a lessee of the premises, or, at the very least, was a licensee; and that L. S. U., and hence plaintiffs, are estopped to deny that Union properly and legally occupied the premises. Of course, they deny that there was any conspiracy between Union and Livestock. Accordingly, defendants deny any liability whatever to plaintiffs.

The issues thus presented will be discussed in narrative fashion, in the light of the facts we find to have been proven.

First, because the relationship of the parties is of substantial importance in determining their legal rights or liabilities, we cover the question of whether Union occupied L. S. U.'s premises as a trespasser, as a lessee, or as a licensee. Unquestionably, it entered Livestock's barn as lessee, under a written lease which is in evidence. As to L. S. U.'s barn, however, we think Union was not a lessee but was a permittee or licensee. It was not a trespasser. We further find that there was no "conspiracy to trespass" between Livestock and Union.

These conclusions are based on the following considerations: Livestock's

President, Mr. Martin, testified before us at the trial. He obviously is a man of the highest integrity. We believe his testimony, which we think was entirely truthful. On the other hand, Dean Lee of L. S. U. (recently deceased) also enjoyed a reputation for honesty which we do not question. He did not appear at the trial, having given his deposition at Baton Rouge. He was too busy to come to Court, even though we attempted to arrange several different trial dates to suit his convenience. His very preoccupation with his heavy, multiform duties is the answer, we think, to the issue of "permission" *vel non*. Mr. Martin testified that Dean Lee expressly consented to the arrangement. The Dean deposed that he did not. After reading the Dean's deposition, and having noted especially how vague his recollection was on so many points, we are sure his memory failed him. To Mr. Martin this transaction was a highly important event, which he remembered well. To Dean Lee it represented merely one more detail in his complex, State-wide duties—a detail which he probably forgot almost as soon as it happened, due to other distractions close at hand. Moreover, the "wish" was probably the unconscious "father" to the "thought" in that there could have been a serious question of no insurance coverage for the University because he neglected to notify the insurers that the hazard had materially increased.

Therefore, as stated above, we are convinced from all the evidence that Dean Lee actually gave his consent to Union, through Mr. Martin, for its use of the building. This being so, Union was a licensee. It was not a lessee, because no lease price was to be paid. LSA–C.C. art. 2670. Since consent was given by L. S. U., no "conspiracy" against its interests, by Livestock and Union, could have existed.

■■ Contrary to plaintiffs' allegation, Act 174 of 1946 does not prohibit use of the property for such a purpose. It merely authorized erection of the building for use in livestock exhibits, not "solely and exclusively" for such purposes. Surely the Legislature did not intend for the building to be used only for livestock exhibits, several times a year, and to sit idle the remainder of the time. Neither does Section 12 of Article 4 of the Louisiana Constitution of 1921, also relied on by plaintiffs, prohibit such use. That Section merely provides:

> "The funds, credit, property or things of value of the State, or of any political corporation thereof, shall not be loaned, pledged or granted to * * * corporations, public or private; * * *".

The Supreme Court of Louisiana has held in two cases, State v. Board of Commissioners of Port of New Orleans, 153 La. 664, 96 So. 510, and City of New Orleans v. Disabled American Veterans, 223 La. 363, 65 So.2d 796, that this Section does not prohibit the leasing of public property; and we think the term "loaned", as there used, means a loan on credit, not an emergency licensing for use in the public interest, as was here involved.

■ The President of L. S. U., General Troy Middleton, testified that Dean Lee had no authority to lease or grant a license to use the property without the consent of the Board of Supervisors of the University. The fact remains, however, that the Dean was the head of the University Department having over-all charge of the property, and he clearly had ostensible, if not express, legal authority to license its use. In that respect, we note the following statement found at 53 American Jurisprudence, Trespass, Section 39, page 866:

> "As an application of the general rule that one may not maintain an action for a wrong to which he has consented, consent or license may be a defense to an action of trespass, provided it is granted by one in possession, or entitled to possession, of the premises, even though given under a mutual mistake of fact. Consent may be implied from custom, usage or conduct."

See also 33 American Jurisprudence, Licenses, Section 91, page 398:

> "There are also other incidents attaching to a license. It is an authority to do a lawful act, which, without it, would be unlawful, and while it remains unrevoked is a justification for the acts which it authorizes to be done. According to this principle, a bare parol license, while unrevoked, even though without consideration, will furnish a justification for an act which would otherwise be a trespass. It is not material that a mere license is or is not in writing; nor is it essential that it be on a consideration."

■ Dean Lee's deposition itself shows that he knew of the occupancy by Union at least by October 28, 1953, more than two weeks before the fire occurred. He took no steps to repudiate the occupancy. His knowledge thereby became L. S. U.'s knowledge, Culver v. Culver, 188 La. 716, 178 So. 252, and the transaction was ratified by failure to repudiate it positively. Bonneau v. Poydras, 2 Rob., La., 1; Pitts v. Shubert, 11 La. 286; Ball v. Bender, 22 La.Ann. 493. We further conclude that L. S. U. was estopped, and plaintiffs are estopped, from denying Dean Lee's authority to give adequate consent to Union's occupancy of the premises. Whittington Company, Inc., v. Louisiana Paper Company, 224 La. 357, 69 So.2d 372; Young v. Gretna Trust & Savings Bank, 184 La. 872, 168 So. 85.

■ As stated, plaintiffs have failed to prove the existence of a conspiracy between Livestock and Union. Absent such a conspiracy, Livestock cannot be held liable to plaintiffs under any theory, because it was Union, and it alone, which undertook the storage operation. It was in sole and complete charge when the fire occurred. Hence, our consideration from this point forward deals entirely with whether Union is liable.

It really makes no difference to a proper decision of this case whether Union was a lessee or a licensee, for in either status it still owed the duty to L. S. U. to use that degree of prudent care required by the particular circumstances of the operation it had undertaken. That brings us directly, therefore, to consideration of the questions of (1) whether *res ipsa loquitur* is applicable, and (2) whether Union was guilty of negligence proximately causing the damages plaintiffs sustained.

In determining, as a matter of law, whether the *res ipsa loquitur* doctrine properly should be applied here, we find that the overwhelming preponderance of the evidence—indeed, there is none to the contrary—proves the following ultimate facts:

1. Union was in complete, exclusive control of all cotton placed in the buildings, including the bale or bales which ignited the general conflagration;

2. A fire such as this does not occur ordinarily in the absence of negligence; and,

3. Plaintiffs do not know, and reasonably could not be expected to know, the exact cause of the fire, whereas Union, having been in full charge, is in a better position to know and to explain the cause.

■ These facts being so, according to the Louisiana jurisprudence there is no doubt but that this is a classic case for application of the doctrine. Northwestern Mutual Fire Association v. Allain, 226 La. 788, 77 So.2d 395; Plunkett v. United Electric Service, 214 La. 145, 36 So.2d 704, 3 A.L.R.2d 1437; Carter v. Middleton, La.App., 76 So.2d 594; New York Underwriters Ins. Co. v. B. H. Prewitt & Sons, La.App., 55 So.2d 303; and cases therein cited.

■ These authorities hold that application of the doctrine to a given case automatically carries with it the imputation of negligence against the party charged, from the effect of which imputation he is required to exculpate himself by convincing proof. Clear evidence as to the actual cause, coupled with a satisfactory showing that the party charged was free from actionable negligence,

serves as a complete exoneration. It does not follow, however, that a negative showing, of freedom from negligence, is sufficient to effect the same result.

Even if we are mistaken in applying the doctrine here, nevertheless, in reaching our ultimate decision of the case we are not compelled to rely on Union's failure fully to exculpate itself, for the proof is clear and convincing that it was guilty of actionable negligence, in at least one major respect, which proximately caused the fire and resultant damages:

"Fire bales" of cotton not infrequently result from the use of modern, high-speed ginning equipment. Foreign objects, such as rocks, nails, or the like, which somehow have gotten into unginned cotton, are carried with it through the gin at a rapid rate. In passing over the metal combs, a spark may be struck igniting a small fire in the cotton which then is compressed into the bale. Due to lack of sufficient oxygen, and depending upon its location within the bale, such a fire may smolder as long as several days before burning its way to the surface and erupting into flame.

Cotton is known to be a highly combustible material, as was demonstrated so forcefully in this case. Consequently, it is of the utmost importance, in handling and storing freshly-ginned cotton, to guard carefully against the strong possibility, or even probability, of such a bale being present. It is equally imperative that "fire bales" be removed from other cotton before they burst into flame, for fire will spread rapidly, as it did here, if this is not done.

The presence of "fire bales" is detected by sight, smell or touch. All persons handling the cotton constantly should be on guard. Included in this category, in the order of handling, are those who unload it from trucks and take it to the scales for weighing; the person who records the weight; the one who places identifying tags on each bale; the "sampler", who cuts a moon-shaped opening through the jute binding on each side of the bale, and removes cotton samples; the "loose-puller", who pulls off any loose-hanging fibers; the "sweeper", who sweeps up loose cotton from the floor or ground; and the "stacker", who actually places the bales in the warehouse with a portable mechanical lift. In addition, special fire "watchmen", having no other duties, should be employed to make regular rounds throughout the warehouse, at least once each 30 minutes, particularly in areas where no one is working.

All of the experts agree that, with proper care, "fire bales" can be found and removed in time to prevent a holocaust.

These are standard precautions in the industry, even in warehouses designed for cotton storage, fully equipped with automatic sprinkler systems, brick fire walls, sufficient fire hoses, and the like. In a makeshift warehouse, such as here, with no sprinklers and no fire walls, and known to be receiving freshly-ginned cotton, strongly potential for "fire bales", the need for extra caution was even greater.

Everyone agrees that a "fire bale" caused the fire on November 12, 1953. It somehow got past the handling crew and was placed in Livestock's barn, to one side and near the common wall between the two buildings. It was in a row or stack of bales that had been placed, either early in the morning of the fire, or late in the afternoon before. Each stack, running lengthwise of the barn, was two bales high, and two or more bales in width, with 12-foot aisles between. The over-all height of the stacks was about 9 or 10 feet, substantially higher than a man's head.

By about 2:45 or 3:00 P.M. on November 12th, at least two other longitudinal stacks had been placed between the one where the "fire bale" was located and the one the "stackers" then were arranging. They were working at the moment near the end of the building farthest from the common wall, and on the side opposite from the location of the "fire bale". One of these men happened to walk to an aisle next to the common wall, when, looking to the far side of the

building, he saw flames licking up the stack of bales. He immediately gave the alarm, but the fire spread so rapidly that those who then entered the building were forced to turn and run for their lives, being unable to use any of the fire hoses or water buckets which Union had placed at various points.

The proof clearly shows that not one of Union's employees had been in the immediate vicinity of the "fire bale" for a number of hours before the fire broke out. At noon that day, when all the other employees went to lunch, one man acted as a psuedo-watchman, and punched a time clock at various stations in the two buildings. However, he did not see or smell any smoke. He admitted that his tour of the buildings did not require him to go, nor did he go, through the aisle next to the stack where the fire originated. It had been, therefore, not less than 2 or 3 hours, and probably as much as 8 hours (the night watchmen had left at 7:00 A.M.), since any one had gone close enough to the "fire bale" to detect its presence.

It is our judgment that this failure properly and prudently to patrol each and every aisle in both buildings, at least once each 30 minutes, in order to detect and remove any "fire bale" which might have been present—and this "fire bale" in particular—was negligence which was the proximate cause of the fire.

Union argues that practice in the industry does not require separate watchmen when other workers are present, as here, because they are supposed to serve as watchmen. That may be true as to cotton in the immediate area where they are working. Nevertheless, here there was a situation where all other employees except the "stackers" were working outside the building, or just inside, and the "stackers" were occupied with their duties at a point approximately 100 to 150 feet from the origin of the fire, and 300 feet or more from some of the cotton in L. S. U.'s barn. They could not see over the stacks of bales and surely could not smell the smoke at that distance.

It seems clear to us that areas away from the situs of actual stacking operations should have been patrolled by a watchman employed especially for that purpose. Common prudence ought to have dictated such a course. If it had been followed, undoubtedly the "fire bale" would have been found and removed in time to have prevented the general fire.

This fire was not the result of a *vis major*, nor was it due to an unavoidable accident. It resulted from negligence, but for which it could and should have been prevented. That negligence was Union's. It could not have been the fault of anyone else. Thus we find that Union is liable to plaintiffs, the amounts of whose claims are not disputed.

For these reasons, there will be judgment rejecting plaintiffs' demands against Northeast Louisiana Livestock Show, Inc., and there will be further judgment, as prayed for, in favor of plaintiffs and against Union Compress and Warehouse Company, Inc., with interest according to law, plus all costs.

Separate decrees should be presented for signature.